Thank you, Your Honor. May it please the Court, Colin Stretch on behalf of AT&T California. The issue in AT&T's appeal involves entrance facilities. These are transmission lines that run between a competitive carrier's network and an incumbent's network. A competitive carrier wants to use those facilities to reach the point of interconnection on the incumbent's network. Now, there's no dispute on the AT&T network. Correct. That's an interconnection. Correct. Yes, that's exactly right. There's a point of interconnection on the AT&T network at the AT&T central office, and the facility is being used for the competitive carrier to bring its traffic essentially to that point of interconnection. And there's no dispute that these facilities are not available under Section 251C3 of the 1996 Telecom Act. That's the provision pursuant to which Congress directed incumbents to provide piece parts of their network in certain circumstances. The question is whether, nonetheless, these same facilities are required under Section 251C2, the interconnection mandate of the Act. And the PUC concluded that they are, and it did so in reliance on Paragraph 140 of the FCC's 2005 Triennial Review Remand Order. And that's really the nub of the dispute here this morning. Does Paragraph 140 of that order, as the PUC held, require incumbents such as AT&T California to provide these entrance facilities at subsidized rates pursuant to Section 251C2? And the language of that paragraph is key. The language provides that the FCC's unbundling determination, that is to say its determination under Section 251C3 that these facilities are not required under that provision does not alter incumbents' Section 251C2 obligations. So the key question is what came before the Triennial Review Remand Order that's not being altered? What's wrong with just reading 251C2 and seeing that unbundled rates are provided to reach the AT&T network, in other words, the interconnection? I think the key point, Your Honor, with respect to the language of Section 251C2, and it is critically important to this appeal, what that language provides is not that point of interconnection. What it provides is that the incumbent has a duty to provide for the facilities and equipment of any requesting telecommunications carrier interconnection at a single point. So what you have is an interconnection point on the incumbent's network. And what Section 251C2 says is for the facilities and equipment of the requesting carrier, the incumbent has to permit that to be interconnected at a point. What we're talking about here is a point. Kennedy. No, not to permit it. It says to provide interconnection with the local exchange carrier's network. So what you're saying is that the CLEC should provide its own entrance facilities and not use your own entrance facilities, although your entrance facilities are connected to your network. Well, respectfully, Your Honor, our point really focuses on the language for the facilities and equipment. How about answering my question? I'm sorry, Your Honor. Are your networks connected to your entrance facilities? Yes, they are, Your Honor. All right. Isn't connection to your entrance facilities a way to provide interconnection with a local exchange carrier's network? No, Your Honor. And I need to explain why. Why? It's a little complicated because of the connection. You mean there should be the word direct connection in there as opposed to indirect connection? No. Actually, that's not what I'm getting at, respectfully, Your Honor. What I'm getting at is that there is a point of interconnection, and that's in the text of Section 251C2. And the point is on the incumbent's network. Now, I think what Your Honor is suggesting that at the end of the entrance facility, over here on the SELEX network, that conceivably, if they attach their equipment there, then essentially they're interconnecting. But at that point, if that's what's going on, and our position is actually they're not permitted to interconnect at the end, but that's not the issue here. If, in fact, they were permitted to interconnect over here at the end of the entrance facility, it would no longer be an entrance facility. In other words, because you're already on AT&T's network over here. The point here is that this is a... Mr. Stretch. Yes. If your network, AT&T network, is connected to your entrance facility, and by connecting to the entrance facilities, that will effect an interconnection between the CLEC traffic and your network. Why isn't that an interconnection with a local exchange carrier's network? I think, again... You'd be much better off if it said a direct connection, not an indirect connection. Well, I think, Your Honor, we still have to figure out what to do with the language in the statute that talks about having interconnection at a point within the incumbent's network. And so what interconnection is, is the actual physical... Are you saying that the entrance facilities are not within the interconnecting network? That actually is our position, Your Honor, but it's not something that I think the Court needs to address here, because in this circumstance, where a CLEC is using the entrance facility, it's only an entrance facility because it's using it to get its own traffic to the point of interconnection. Now, each carrier is responsible for its own network on each side of the point of interconnection. Is your point that only the outside portion of the entrance facility connects with the network? My point is that if you're construing the point of interconnection to be on... Where's the point of interconnection in the statute? The point of interconnection is at a point within the incumbent's network. And... Where do you see that? Any technically feasible point?  That's in Section 251c2b, at any technically feasible point within the carrier's network. And in the Triennial Review Order, now, the FCC talked about what's inside the incumbent's core network and what's outside the incumbent's core network. So your point is that the entrance facilities are not part of the carrier's network? That is correct, Your Honor. Our point is that the entrance facilities are not part of the incumbent's network that you can interconnect into, that you have to interconnect at the central office of the incumbent carrier. And any technical feasible point within the carrier's network means directly to the carrier's network and not indirectly through the entrance facilities. That's certainly true, Your Honor. I think at that point... That's your point?  Yes. And that's the point that you'll have to answer. And I think, Your Honor, if you go back to the FCC's rules and orders in which they promulgated, they provided content to the Section 251c2 obligation. And this is really the 1996 local competition order. If you look at the relevant paragraphs there, paragraph 198, paragraph 202, clearly what the FCC is contemplating here is accommodating the requesting carrier's facilities, that the requesting carrier gets its traffic to the point of interconnection. In the words of this Court in Peavey, that the originating carrier gets a call to the point of interconnection, and it's that point at which it gets handed off. But there's no suggestion in those orders, in the FCC's discussion of this, that the actual equipment, the facilities and equipment that the CLEC uses to get from its own network to the point of interconnection on the incumbent's network is contemplated under Section 251c2. And that's absolutely critical, because I want to go back to paragraph 140 of the Triennial Review remand order. Again, that's the paragraph that the PUC relied on below to conclude that incumbents do have to provide these facilities pursuant to Section 251c2. And all it says is that it's not altering anything. It's not changing anything. So to really understand what the obligations are pursuant to Section 251c2, you've got to go back and you've got to look at the FCC's rules and orders and understand what exactly it was trying to do. And respectfully, if the Court takes a careful look at paragraph 198 and 202 and 553 of the local competition order, it will conclude, I'm quite confident, that what the Commission is talking about is accommodating at the central office the CLEC's facilities, not providing the facility it uses to get there. And I realize my time is running short. I want to make one further point. The Seventh Circuit decision, which adopted a contrary reading, it, too, like the PUC, relied on paragraph 140 of the Triennial Review remand order, but it never asked the critical question. And that's the question that really needs to be answered to reach that result. What was there before the Triennial Review remand order that created this obligation that's not being altered in that order? And respectfully, there is nothing, quite literally nothing, there that imposes this obligation. Thank you. All right. Good afternoon. May it please the Court. My name is Laura Gossar, and I represent the California Public Utilities Commission and its commissioners. We ask the Court today to affirm the District Court's decision upholding the AT&T must provide its competitors with entrance facilities when used for interconnection at cost-based rates. This case is about connecting the different telephone customers of different telephone networks, allowing the customers of one network to call the customers of another telephone carrier's network. Well, there's nothing preventing you, is there, Ms. Gossar, from connecting directly to the AT&T network and not to its entrance facilities, is there? The entrance facility is what actually provides that interconnection, Your Honor, and that is what the FCC discussed in its orders. Well, it provides it, but there's nothing to prevent you from putting your own entrance facilities in and connecting those to the AT&T network, is there? That's correct. But the statute provides, Section 251c2 requires the incumbents to provide that entrance facility, to provide the facilities that enable interconnection. Just looking at the statute, how do you interpret, it says, the duty to provide, comma, for the facilities and equipment of any requesting telecommunications carrier, which makes it sound like the facilities and equipment are those of the requesting carrier, and that all that the ILAC has to do is to provide the interconnection at a feasible point. With all due respect, that is not the most rational interpretation of the language, and it's too narrow of an interpretation. It's just what it seems to say. Well, you have to look at the statutory purpose. One of the primary purposes of the statute is to increase and maintain the right to interconnection, to ensure that the customers of different carriers can talk to one another and expand the ability of competitors to link their networks with the networks of the incumbents. AT&T's interpretation, on the other hand, limits the ability to interconnect and may even hinder the ability of competitors to provide that link between its customers and the customers of the incumbent. Well, then, how do you interpret the phrase, for the facilities and equipment of any requesting carrier? Let me just go back to the way the telephone system is structured. The incumbents have networks and the competitors have networks, switches, lines, that need to be connected to one another so that the customer of one network, a competitor's network, can talk to the customer of an incumbent's network. So to enable that connection, there has to be a physical link, an actual cable that connects the two networks. So when the statute talks about the facilities and equipment of a requesting carrier, it's talking about the switches. The stuff behind it. Exactly. The switches, the loops that connect to customers. Well, you say that. So is there any place in the statute where facilities and equipment are defined so that we can say that facilities and equipment do not apply to exchange entrance facilities and do apply to simply the wires of the CLEC seeking out the wires of the ILEC? If it were only that easy, Your Honor. Congress did not define the term interconnection. So in the absence of a definition, the FCC interpreted that right very broadly. It determined that interconnection can happen in a variety of different ways, at a variety of different locations, so that when you look at 251C2, it doesn't say explicitly what an incumbent must do to satisfy its obligation to interconnect. So certainly, if there is no definition, you can't read that section as categorically excluding the provision of the actual facility that facilitates interconnection. So you're telling me that facilities and equipment in 251C2 are not defined elsewhere in the Act, number one, and neither are entrance facilities, number two. That's correct, Your Honor. All right. Excuse me. Paragraph 140 of the Triennial Review Remand Order is clear on its own. The statutory right to interconnection set forth in 251C2 remains unchanged. Let me explain the difference in uses of entrance facilities that the FCC set forth in the TRRO. We talked about interconnection, the physical link between networks so that the carrier, the customer of one carrier can talk to the customer of another carrier. There's a separate and distinct use of entrance facilities called in the industry backhaul. That's when the competitors use the physical link not to facilitate traffic going between their customers and the incumbent's customers, but to connect their own customers. That's what the FCC focused on in the orders, the unbundling orders, the TRO and TRRO, and that's the use that they determined no longer needed to be provided at needed to be provided by incumbents at cost-based rates. That did not affect, however, the statutory right to obtain interconnection facilities, and that's what's at issue here. May I ask a question with respect to paragraph 140? The last sentence reads, Thus, competitive LECs will have access to these facilities at cost-based rates to the extent that they require. Now, does require mean can't do it any other way, or does it mean more convenient? Well, I don't believe that any court has addressed that particular question so that our belief is that when the requesting carrier, under the paragraph 251C2, asks for interconnection, the incumbent must provide it. So it's not a question so much of requiring, it's just simply a request at any technically feasible point. But it doesn't say to the extent that they request them. That's true. It says to require them. That's true. This imports an element of necessity, which is absent if the issue is one of convenience. Well, if you look at this paragraph in the context of the entire TRO and the TRO that preceded it that talked about these two distinct uses, the backhaul use and the interconnection use, the FCC, as I said before, interpreted the interconnection right very broadly, didn't differentiate between the times that the carrier needed it, just that the right had to be interpreted not to exclude methods of interconnection, but to include as many as possible. Let me ask you a question. Suppose that AT&T didn't have entrance facilities. Would your interpretation of the statute mean that AT&T would have to go out and rebuild them to interconnect between the CLEC and the ILEC customers? Well, excuse me, both the FCC and several courts have held exactly that. The FCC, in the local competition order, talked about the incumbent's obligation to build out their facilities, modify their facilities, and adapt their facilities to accommodate interconnection with incumbents. Two cases, one cited by the Commission and one cited by AT&T, U.S. West Communications v. Minnesota Public Utilities Commission, 1999 District of Minnesota case, as well as the U.S. West Communications v. Jennings case here in the Ninth Circuit, held that indeed incumbents must actually build the facilities, the entrance facilities, necessary for competitors to interconnect. And I see that my time is running out. So I do want to point out that the FCC agrees with this interpretation. The FCC filed an amicus brief in the Sixth Circuit on this very issue. The Commission submitted it to the Court in May. I have copies with me. If the Court does not have copies. Is it your point that this is an ambiguous statute which is entitled a Chevron deference? Well, yes, the FCC does make that a position in its brief. But what's key about the brief is that the FCC states that although it did not define what it meant by the term interconnection facilities in paragraph 140, it is completely consistent with the TRRO to interpret interconnection facilities to include entrance facilities when used for interconnection. All right. The Seventh and Eighth Circuits also agree with this position. They address the very same question and focused on the language of paragraph 140. I also want to address in my last 20 seconds AT&T's discussion of interconnection needing to be at a point on a network. Interconnection with an entrance facility is always going to occur on a point on the incumbents' network.  So to talk about one particular length of cable being long or short and that dictating whether an entrance facility occurs at a point or not is taking an overly narrow view, an overly narrow view of interconnection that's contrary to the FCC's interpretation. Whatever the method, interconnection is always going to occur at a point on the incumbents' network. It's just a matter of where and how. Oh, I still have 30 seconds. Oh, my goodness. No, no. You're over 32 seconds. Oh, my goodness. Okay. She's not. Thank you, Your Honor. No, she's not. Is it red? Yeah, and it's getting bigger. Okay. I think I had hoped to reserve three minutes of my total of 20. I'm not sure. Three. Wait. I thought. Here. We're still on this. Yes. Right here. That's what you wanted. You wanted three. Well, go ahead. Okay. I think we do need to return to the text of the statute and just briefly make what Ms. Gasser explained is right, that the entrance facility plugs into the incumbents' network. That's the point of interconnection. What is problematic about the PUC's construction here is that the entrance facility belongs to us. So it's not interconnection for the facilities and equipment of the requesting carrier. It's really that simple, as Your Honor suggested in her questioning. There is a clear distinction in the statute between our facilities and the requesting carrier's facility. And if you look at Section 251c3, the immediately neighboring subsection of the statute, it explicitly requires incumbents to provide facilities, piece parts of its network in certain circumstances. So the notion that Section 251c2 should be required to do the same thing, even though it talks exclusively about competitive carriers, facilities and equipment, I think is just incorrect. Now, with respect to the FCC's statement, and it's an amicus brief, to the extent the statute is ambiguous, we think it's not, but to the extent it is, the statement in the FCC's amicus brief as to the meaning of Section 251c2 is entitled to no deference from this Court whatsoever. I think the law is absolutely clear on that. The Supreme Court's decision in Christensen, this Court's decision in Basiri v. Xerox, makes absolutely clear that if an agency is to provide an authoritative construction of a statute pursuant to its deference, to the deference it's afforded under Chevron, it needs to invoke agency process. It needs to go through informal or formal rulemaking. An amicus brief filed in another case does not remotely qualify. And therefore, it's really up to this Court to do the best it can with the statute. We think the text is plain, but there is clearly no agency authoritative construction to which the Court could defer. I want to make one final point with respect to Judge Bea's suggestion that paragraph 140, the very last sentence talks about, require. These are facilities, what the FCC is saying, what does do the competitive carriers require in order to interconnect? And that's at the end of a discussion in which the FCC has just talked about for four paragraphs how relatively easy it is for competitive carriers to deploy their own entrance facilities. Because these are facilities that have a lot of traffic. The competitive carriers determine where they should be placed, and so they can dictate the length. So the notion that after that entire discussion, the FCC would suggest that they require the incumbent's entrance facilities in order to interconnect, I think, is just mistaken. And yet, that's exactly what the PUC required here. If you look at the language, the actual agreement language that the PUC required, and it's at excerpts of Record 63, the CELECs are entitled to entrance facilities to interconnect whenever they want them. It's not when they need them. It's not when they require them. It's when they request them, when they want them. Thank you, Your Honor. Thank you. Okay. Bill number two. Okay. Good afternoon, Your Honors. May it please the Court. My name is Clay Deanhart. I'm counsel for Intervenor, Defendant, and Cross-Appellant, CBION Communications LLC.          Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.   Thank you. Thank you for this hearing. CBION's appeal addresses the proper interpretation of 47 CFR Section 51.319e2iBC, a regulation referred to in the telecom industry as the DS1 transport cap, which is the way I will refer to it today. Under the authority cited by CBION in its briefs, the two key questions before the Court today are, first, does the District Court's interpretation of the DS1 transport cap violate 47 U.S.C. Section 251c3 and other FCC regulations? And two, if so, is there a reasonable interpretation of that regulation that would not create such an absurd result? The answer to both questions is yes. The District Court erred by interpreting the DS1 transport cap to apply to all transport routes where DS1 transport circuits were otherwise required to be unbundled by the FCC. That interpretation violates Section 251c3 and other FCC regulations by failing to apply the cap only to routes expressly described in the FCC's Triennial Review remand order. When was Triennial Review adopted? 2003, right? I believe that's right. Yes, Your Honor. The ruling question was adopted when? As part of the Triennial Review remand order, Your Honor. It was a regulation promulgated along with that order. But it was later than the Triennial Review? No, Your Honor. It was one of the regulations that was – it's a regulation that was attached to the Triennial Review remand order. It may have gone into effect after some time after the order, but it was – If it goes into effect after the Triennial Review order, why doesn't it trump it? The Triennial Review remand order, Your Honor? I mean, the rule itself is very clear. It says – it doesn't say 10 DSI maximum under certain conditions. It says 10 DSI maximum. Certainly. DS1, I'm sorry. Right. And so I think what Your Honor is focusing on is this is the plain language of the rule, and how do we get past that? Right. I don't have to get past it. I have to enforce it. Well, I think we can – I think we do get past it under the Supreme Court cases in Green v. Bach-Laundrie, under U.S. v. Katz, when the plain language of the regulation leads to an absurd result. What absurd result is it? In this case, the absurd result is that if you read the language the way the district court did, it necessarily violates Section 251c3, 47 CFR, Section 51.307a, and 47 CFR, Section 51.317 – I'm sorry, 319. Why? Why? It says you can get 10 DS1 lines, period. Certainly. If you want more carrying capacity than that, you've got to get DS3 lines. Right? No, sir. What it – what the – it's a couple of steps to get there, Your Honor, if you'll follow with me for a moment. The FCC found that carriers were impaired for DS1 circuit – DS1 transport circuits on all but the most traveled routes between wire centers, those they called the Tier 1 routes. Once they made that determination, AT&T and other incumbents were required to provide access to DS1 transport circuits on all but those routes, unless – and that, by the way, is what Section 251c3 says. That's what CFR Section 51.307 says. And that finding, the finding that SELECs were impaired without access to those circuits is what's in 319e2, et cetera, a. Once the FCC made that determination, it would be illegal for anyone to say you can't – by illegal, I mean contrary to law, a violation of those statutes and regulations. For someone to say you can't have access to any level of DS1 transport routes without an additional finding. The FCC made that additional finding on a very narrow circumstance with respect solely to more than 10 DS1 transport – more than 10 DS1 transport circuits on routes where there are DS3 transport circuits. That's at paragraph 128 of the training and review remand order. But – and here's the significant piece – it never made that finding for DS1 transport circuits on routes where carriers remain impaired for DS3 transport circuits. The FCC never said in its remand order that we have made a finding that on routes where there are 10 – more than 10 DS1 transport circuits on routes where you remain impaired for DS3 transport circuits, you can't buy them. Under the various authorities that we cited in our brief and under the Motor Vehicle Manufacturing Association v. State Farm, the FCC can't act without making specific findings to support that act. If the FCC could not take away the impairment finding that it had made without a specific finding, then CBEYOND contends that the district court can't do that through an interpretation of the regulation. That by interpreting the regulation in this way, it leads to the absurd result of violating those statutes and regulations that I mentioned. Is your position here essentially the same as it was in the Texas case? No, Your Honor. It's not. In the Texas case, which is the district court case, I believe that CBEYOND – and I did not handle that case – but I believe, Your Honor, that CBEYOND basically argued – it is the same in the sense that CBEYOND argued that the – what the regulation means is that it only applies to routes where DS3 transport does not have to be unbundled. Okay. So that part is the same. What's different is there they kind of argued about whether or not the regulation was ambiguous or unambiguous. Here we're saying it doesn't matter. Even if it's plain language, because that interpretation violates the statute, it can't be – it can't be sustained under the supreme court precedence. And what violations does this absurd result lead to? Would you give those to me slowly again and not rattle them off too quickly? I apologize. Yes, Your Honor. First, it denies – there has been a finding that CBEYOND and other SELEX must have access to DS1 transport circuits. Why? Because the FCC said so in the remand order, and it made the specific finding that those transport circuits should be unbundled. That finding was affirmed by the D.C. Circuit Court of Appeals in the COVAD case. Now that that finding has been made, 251c3 requires ILEX incumbents like AT&T to provide that access. So do the two regulations that I referred to. If there has not been a separate finding that SELEX are not impaired in certain circumstances, then any regulation or any interpretation of a regulation denying them access to the transport circuits that the FCC found must be unbundled violates 251c3, CFR section 51.307a, and 47 CFR section 51.319e2iA. Okay. Thank you very much. You're welcome. Did the district court deal with this argument? Just quickly. I know we're giving you time. Did the district court actually deal with this argument expressly? Not the absurd result argument, Your Honor. No. It did not. Did you make it? No, ma'am. Was it made? No. No, ma'am. Well, ma'am, CBION was not involved at the district court. We intervened in this regard. You know, the record has all the motions and things where we handled that. But at the time, the district court was considering a ruling that the PUC had already ruled in CBION's favor. So we had no reason to participate in the district court proceeding because the PUC had found in our favor. What is the saying between the arguments is that we are saying, and the PUC said, you have to read the regulation in line with the Tri-Interview Remand Order. Okay? And what we've done in this appeal is we've said, here are additional reasons why you have to do that. And the additional reason is because if you don't, you get to an absurd result. Okay. So you intervened at one point? After the AT&T filed, well, after around the time AT&T filed its decision here, or its appeal. So we intervened when we learned that the PUC was not going to cross-appeal this issue. We intervened to take on that cross-appeal. All right. Thank you. Thank you, Your Honors. Now, Mr. Stretch, you're going to talk nicely about the CPUC. I think the CPUC made a very wise decision not to appeal the district court's And the reason that's so, Your Honor, is that the regulation on this issue could not be any clearer. And, in fact, everyone agrees that the regulation says where you get 10 DS1 — I'm sorry. Where you get DS1 dedicated transport as an unbundled network element, you get 10, period. No exceptions. Why do they draw the line at 10? They draw the line at 10 because if you look at paragraph 128 of the Triennial Review remand order, and that was a 2005 order which promulgated this rule, the FCC said that at 10 DS1 circuits, that's enough traffic to warrant a DS3. That's essentially the crossover point. And it's efficient at that point to get your traffic onto a DS3. Efficient for whom? Well, in this circumstance, if they're buying unbundled network elements, it's efficient for us. I mean, what the FCC is saying there and in its related rules is that by — if you force the incumbent to continue to provide an endless amount of these DS1 circuits, it's inefficient. Now, we're being forced to provide facilities at a subsidized rate. For you, but it's not necessarily more efficient for the — Well, sure. I mean, I'm sure they'd be delighted to have as many as they could. That would be very efficient for them. But in terms of an overall efficiency in the network, that's what the FCC is driving  at. Once you get to 11, you can use a DS3. Now, as to CBON's challenge to the application of the rule and this absurd result that supposedly results, I want to get to the merits. But before I do, I think it's important to keep in mind that this Court has no jurisdiction to address the merits. And the reason that's so, and it's not just because these arguments weren't raised below, although they weren't, nor were they raised before the PUC, it's because the this Court from entertaining a collateral attack on the regulation. And that's exactly what this is. If you look at the Court's decision in United States v. Jennings, okay, it makes very clear, and it's consistent with the Four Circuit's decision in GTE South, which we've cited in our briefs, that for purposes of a case like this, a Section 252e6 case challenging a state commission decision as to arbitrated interconnection agreement language, properly promulgated, and I'm quoting here from Jennings, properly promulgated FCC regulations currently in effect must be presumed valid for the purposes of this appeal. No question as to their validity can be before us in this appeal. Now — I didn't hear a challenge to validity. I think the challenge is to the interpretation. Exactly. But if — That's not different? In this case, it's not different, Your Honor, and I'd like to explain why. They couch the challenge to interpretation or absurdity, but if you listen to it, right, the challenge is the regulation is inconsistent with the statute. The regulation is unsupported by the FCC's findings in the Triennial Review Remand Order. The regulation is absurd. These are bread-and-butter APA claims. These are exactly the sort of claims you bring when you challenge the rule directly, when you bring a Hobbs Act challenge in a proceeding in which the agency that has And that's the key point. And the GTE South Court goes into this. Right? It makes no sense for this Court to be looking under the record of the Triennial Review Remand Order and trying to understand the FCC's findings to support the rule as written when the agency itself isn't even here to defend the rule. That's precisely why the Hobbs Act requires these challenges all to be brought in a consolidated proceeding, and the corollary to that is that this Court is not permitted to entertain those challenges. Now, with respect to the merits, this absurdity claim, even if you assume that you can't entertain it, it's not correct. Now, the rule works as follows. You get 10 DS1 circuits. Okay? If you have more capacity, you use a DS3. If you are impaired with respect to DS3, you get that as an unbundled network element. If you are not, the FCC has found you can obtain it through alternative supply. Either way, there's a limit of 10 DS1s. That's exactly how the rule works. And I think this is critical. There are actually four rules that are, for our purposes, comparable. There's the point where the CLEC asks for more than 10 DS1s. If there is no impairment to them building a DS3, they've got to build it themselves. Right. Or obtain it from a third party. If there is an impairment, which is the economic finding of the FCC, then you have to build it and make it available. Right. We then have to. At DS3 rates. Correct. We then have to. Unbundled rates. That's exactly right, Your Honor. That's exactly right. And it is. If you look at paragraph 128, the opening clause of that paragraph undoubtedly introduces some confusion. But the key point is actually the last sentence of that paragraph. The last sentence of that paragraph says essentially once you get to 11, our DS3 impairment conclusions apply. And that's exactly how the rule works. If you're impaired, you get the DS3 as an unbundled network element. If you're not, you find an alternative source of supply. And I do want to emphasize that there are four rules, and we've cited these in our briefs, that work the exact same way. There's a comparable rule for DS1 loops. There's a comparable rule for DS3 loops. There's this rule for DS1 transport. Is there a simple way in which you can explain the added cost to see beyond in using DS3s provided by you at unbundled rates compared to, say, 30 DS1s? Your Honor, I apologize. I do not have a simple way to explain that. I mean, I'm trying to think about some argument about barriers to entry. As opposed to all the simplicity that has rung through the chambers this morning. I think on this issue, I'm sorry, I just don't have the information to address that. You can talk about regulations. You can talk about theoretics. But dollars is beyond you. Well, respectfully, Your Honor, there is in footnote 358 of the Triennial Review remand order. The FCC refers to evidence that explains why it reached the crossover point it is, and there are lots of dollars and cents figures there. So with that, I believe my time is up. Thank you, Your Honor. Your Honor, addressing the last question you asked counsel, I think the way you explain that is with what we call the crossover point. The problem with the record in this case is that there was not evidence with the crossover point put into the record at the PUC. My understanding is that there was not. My understanding is that it's something like 22 circuits in this case, where it's something like 22 circuits, where, in other words, one would have to buy 22 DS1 circuits before one approximated the cost of one DS3 transport circuit. This is not a Hobbs Act case. This is not a collateral attack on the rules. We are we have raised an appeal based on the interpretation, excuse me, of the judge's order, and in particular, I think that the focus here is on the interpretation. What about his point that your interpretation arguments are all essentially the same as the regulation is invalid because we shouldn't, you know, follow what it says? Actually, Your Honor, my interpretation or our interpretation argument is that there is a reasonable interpretation that keeps the regulation valid. Which is to ignore its plain meaning. No, Your Honor. It is to say that the word, respectfully no, Your Honor, it is to say that the word route, you would interpret the word route to mean a route where DS3 transport is not required to be unbundled. That type of regulatory construction is fully consistent with what the Supreme Court did in Green v. Bach Laundry, where it inserted the word criminal before the word defendant in the federal rules of evidence in order to keep that federal rule from being unconstitutional. It's also what it did in U.S. v. Katz way back in 1926, and it's what this circuit did in Commodities v. Pye, where by interpreting the language of a regulation or a statute in a way that does not lead to absurd results, one preserves the statute or regulation. Thank you. Thank you, Your Honor. Thank you. The matter just argued is submitted for decision. The Court appreciates the quality of the argument presented this afternoon. And the Court has concluded its session. The Court stands adjourned. Thank you.
judges: Schroeder, Tashima, Bea